**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| BROTHERHOOD OF MAINTENANCE OF WAY EMPLOYES DIVISION/IBT, *et al.*, | : | |
| Plaintiffs, | : | Civil Action No.: 16-1109 (RC) |
| v. | : | Re Documents No.: 4, 5, 8 |
| NATIONAL RAILROAD PASSENGER CORPORATION, | : | |
| Defendant. | : | |

# MEMORANDUM OPINION

## GRANTING DEFENDANT'S MOTION TO DISMISS, DENYING PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

## I. INTRODUCTION

Plaintiffs, the Brotherhood of Maintenance of Way Employes Division/IBT and the Brotherhood of Railroad Signalmen (collectively "the Unions") seek a preliminary injunction against Defendant National Railroad Passenger Corporation ("Amtrak"), alleging that it unilaterally implemented new rules that changed working conditions in violation of the statutory "status quo" period required by 45 U.S.C. § 156. *See* Am. Compl., at 1, ECF No. 2; Pls.' Mot. for Prelim. Inj., at 2, ECF No. 4. The Unions and Amtrak are parties to collective bargaining agreements governing pay rates, rules, and working conditions. Am. Compl. ¶ 8. The Unions take issue with Amtrak's unilateral installation of "a video and audio surveillance system with inward and outward facing cameras and audio recording used in vehicles used by [Union employees] and supervisors." Am. Compl. ¶ 13. The Unions allege that the implementation of this system violates Section 6 of the Railway Labor Act ("RLA"), 45 U.S.C. § 156. Am. Compl. ¶ 23. Congress, however, has extended jurisdiction to the federal courts under Section 6 only in

cases of "major disputes," which concern the creation of new contractual rights. Because the dispute over the installation of the video and audio system arguably concerns the interpretation of existing contractual rights rather than the creation of new contractual rights, it is a "minor dispute." Consequently, the Court lacks subject-matter jurisdiction and must grant Amtrak's Motion to Dismiss.

## II. FACTUAL BACKGROUND

### A. The Collective Bargaining Agreements

Amtrak is a rail carrier system partially funded by the federal government. Am. Compl. ¶ 3. The Unions represent a group of Amtrak employees responsible for constructing, repairing, and maintaining Amtrak's track, right-of-way, and other structures, and a group of employees responsible for installing and maintaining Amtrak's signaling systems. *Id.* ¶¶ 6–7. Amtrak and the Unions are parties to collective bargaining agreements (CBAs) that govern rates of pay, rules, and working conditions. *Id.* ¶ 8. The CBAs contain "moratorium" provisions, which restricted the ability of the parties to seek changes to the rates of pay, rules, and working conditions through the end of 2014. *Id.* ¶ 9. Since the beginning of 2015, the parties have negotiated several proposed changes to employee compensation and working conditions. *Id.* ¶¶ 10–12.

#### 1. Express Provisions

Each plaintiff has an identical "System Safety Agreement" with Amtrak that begins with the following introduction: "Amtrak and the [Union] are committed to a safe and healthful work environment, free from intimidation and harassment, that meets or, where possible, exceeds all applicable Local, State[,] and Federal Safety standards and to ensuring compliance with Amtrak's Safety Rules." *See* Def.'s Mot. to Dismiss, Ex. 2, at 6, ECF No. 8-4; Def.'s Mot. to Dismiss, Ex. 3, at 8, ECF No. 8-5. The Safety Agreements proceed to outline procedures for

training, workplace safety, accident reporting and investigation, and other safety-related procedures. *See* Def.'s Mot. to Dismiss, Ex. 2, at 6–14; Def.'s Mot. to Dismiss, Ex. 3, at 8–16. Under the heading "Work Place Safety," the Agreements state that the parties will "use their best efforts to ensure that . . . Amtrak safety rules are properly applied." *See* Def.'s Mot. to Dismiss, Ex. 2, at 9;[1] Def.'s Mot. to Dismiss, Ex. 3, at 11. That same section provides that it is not a violation of the CBA for employees to refuse to start work when any such law or rule is broken. *See* Def.'s Mot. to Dismiss, Ex. 2, at 9; Def.'s Mot. to Dismiss, Ex. 3, at 11. There is no express provision in the CBA that provides for how "Amtrak Safety Rules" are promulgated. The Agreements further provide that Amtrak "shall establish full time [Union] Safety Liaison positions," and that the Union Safety Liaisons are responsible for "[d]etermin[ing] through observation that employees are complying with safe work practices." *See* Def.'s Mot. to Dismiss, Ex. 2, at 12; Def.'s Mot. to Dismiss, Ex. 3, at 14. The Safety Liaisons' observations cannot be used to "initiate discipline." *See* Def.'s Mot. to Dismiss, Ex. 2, at 12; Def.'s Mot. to Dismiss, Ex. 3, at 14.

2. Past Practices

To monitor its fleet of over 300 trains and almost 3,000 "fleet vehicles," "Amtrak has robust safety and asset management programs" in place. *See* Decl. of Michael Logue, Def. Mot. to Dismiss, Ex. 4, at ¶¶ 2–4, ECF No. 8-6. It does so in part to guard against the unsafe use of the vehicles, which can result in injuries, death, and significant loss to Amtrak. *See id.* ¶ 4–5. The procedures have been implemented unilaterally by Amtrak, and many of them are outlined in the Amtrak Policy and Instruction Manual, which is available to employees online. *See* Decl.

[1] Because Defendant uses portions of longer documents as exhibits, citations to Defendants' Motion to Dismiss Exhibits are to the page numbers assigned by ECF.

of Susan K. Reinertson, Def. Mot. to Dismiss, Ex. 5, at ¶ 5, ECF No. 8-7. The Unions have been aware of the use of certain surveillance technologies to some extent. *See* Decl. of Sharon Jindal, Def. Mot. to Dismiss, Ex. 1, at ¶¶ 29, 31–33, ECF No. 8-3.

*a. Video Monitoring*

Without express grounding in a CBA, Amtrak has used cameras and other employee-monitoring equipment in the past. In fact, "[a]ll employees encounter video monitoring at some point in their workdays, many for the entirety of their workdays." *See* Decl. of Susan K. Reinertson, Def. Mot. to Dismiss, Ex. 5, at ¶ 6. This monitoring has existed for years and has been implemented by Amtrak management. *Id.* ¶ 5. Amtrak uses video surveillance for "safety and security" in public and restricted areas. *Id.* ¶¶ 6–7. Video monitoring exists in "stations, bases, maintenance facilities, tracks, bridges, tunnels, power stations, substations, yards, right-of-way shelters, and parking lots." *Id.* ¶ 7. This surveillance can be used in court proceedings and for "other bona fide use[s]," including employee discipline. *Id.* ¶¶ 11, 13. The Unions allege that they understood the existing video surveillance to be only used for safety purposes and to have been "generally paid for by the . . . Department of Homeland Security." *See* Second Decl. of David Ingersoll, Pls.' Memo. Opp. to Def. Mot. to Dismiss, Ex. 2, at ¶ 3, ECF No. 13-2. They also contend that most of the existing cameras are installed in areas where Union employees do not usually work. *See* Decl. of Jed Dodd, Pls.' Memo. Opp. to Def. Mot. to Dismiss, Ex. 1, at ¶ 7, ECF No. 13-1. Although the Unions have known that surveillance technology can be used for employee discipline, *see* Decl. of Sharon Jindal, Def. Mot. to Dismiss, Ex. 1, at ¶ 33, the Unions contend that it has only been used in isolated cases. *See* Second Decl. of Jed Dodd, Pls.' Memo. Opp. to Def. Mot. to Dismiss, Ex. 1, at ¶ 12.

*b. Time Entry Devices ("TED Units")*

Since 2006, Amtrak has used cameras to photograph the faces of employees when they use their electronic information cards to access employee-only areas. *See* Decl. of Ronald R. Nies, Def. Mot. to Dismiss, Ex. 7, at ¶¶ 3–5, ECF No. 8-9; Def. Mot. to Dismiss, Ex. 8, ECF No. 8-10. The information collected can be used to discipline employees for misusing the time-entry system. *See* Decl. of Ronald R. Nies, Def. Mot. to Dismiss, Ex. 7, at ¶ 5. The Unions contend that Amtrak never told them that the system could be used for discipline. *See* Decl. of Jed Dodd, Pls.' Memo. Opp. to Def. Mot. to Dismiss, Ex. 1, at ¶ 8. However, at least one employee and member of a Union has been "reprimand[ed] after . . . [being] captured on camera tampering with a TED unit." *See* Decl. of Sharon Jindal, Def. Mot. to Dismiss, Ex. 1, at ¶ 33.

*c. GPS Monitoring*

To record mileage, speed, and location of Amtrak vehicles, Amtrak also uses GPS monitoring. *See* Decl. of Stephen Kendrick, Def. Mot. to Dismiss, Ex. 10, at ¶ 3, ECF No. 8-12. The GPS units "collect[] data on the following metrics: location; speed; path (with the ability to play the path on a map); the time period the machine was running; the time period the machine was moving; the time period the machine idled; and the locations where the machine stopped and the duration of each stop." *Id.* ¶ 4. The GPS data can be used in employee investigations and discipline. *See id.* ¶ 5.

**B. The Dispute at Issue**

Amtrak is in the process of installing what the Unions call "a video and audio surveillance system with inward and outward facing cameras and audio recording equipment used in vehicles used by [Union employees] and supervisors." *See* Am. Compl. ¶ 13. This "DriveCam" system can be used for "coaching" and employee discipline. *See* Decl. of Jed

Dodd, Pls.' Mot. for Prelim. Inj., Ex. 1, at ¶ 19, ECF No. 5-1. The "Video Event Recorders" (VERs) capture video only if "an irregular event triggers recording."[2] *See* Decl. of Michael Logue, Def. Mot. to Dismiss, Ex. 4, at ¶¶ 7, 14. When such an event triggers recording, the DriveCam captures twelve total seconds of audio and video—eight before the event, and four after—and sends it to an outside organization that reviews it, and, if it meets a "threshold of concern," sends it to Amtrak. *See id.* ¶¶ 15–18. No one can access DriveCams for live monitoring, and Amtrak cannot remotely trigger recording. *Id.* at 20–21. In total, the system saves about five minutes of recording per vehicle per month. *Id.* ¶ 23. This is the only form of audio monitoring Amtrak has ever used. *See* Second Decl. of David Ingersoll, Pls.' Memo. Opp. to Def. Mot. to Dismiss, Ex. 2, at ¶ 4. Amtrak has stated that the purposes of the system are to "ensur[e] the safety of all of [its] . . . employees," "protect [its] employees and structures from dynamic threats," *see* Letter from Charles Woodcock to Jed Dodd, Def.'s Mot. to Dismiss, Ex. 15, ECF No. 8-17, and record accidents for the purpose of correcting drivers and exonerating them from false claims, *see* Decl. of Michael Logue, Def. Mot. to Dismiss, Ex. 4, at ¶ 9.[3]

---

[2] Such events include "crashes, excessive speeding, rapid acceleration, sudden stops, and irregular maneuvers." *See* Decl. of Michael Logue, Def. Mot. to Dismiss, Ex. 4, at ¶ 15, ECF No. 8-6.

[3] The Unions contend that Amtrak's safety justification was contrived after-the-fact, and that the actual purpose of the system was to limit Amtrak's exposure to liability and minimize medical and repair costs. *See* Pls.' Mem. of Law in Supp. of Mot. for Prelim. Inj., at 5, ECF No. 4-1. The Unions articulate a distinction without a difference. The DriveCam system is, even according to Amtrak, aimed at minimizing accidents through safer driving and to record incidents for the purpose of exonerating drivers—and, in effect, Amtrak—from liability. *See* Decl. of Michael Logue, Def. Mot. to Dismiss, Ex. 4, at ¶ 9. A necessary intermediate step between implementation of the DriveCam system and a decrease in liability and medical and repair cost is an increase in safe practices. Ultimately, the Unions' argument amounts to a contention that Amtrak was not striving for safe practices for the altruistic good of their employees, but rather for the good of their bottom-line. For purposes of interpreting the employee safety agreements, it does not matter *why* Amtrak strives for safety; it matters only that the agreements' stated purpose is safety. *See* Def.'s Mot. to Dismiss, Ex. 2, at 6, ECF No. 8-4; Def's Mot. to Dismiss, Ex. 3, at 8, ECF No. 8-5.

Amtrak maintains that the system is not intended for use in employee discipline, but does not go so far as to say that it will not use it for that purpose. *See* Def. Mot. to Dismiss, Ex. 18, at 16, ECF No. 8-20. In support of its aim of protecting its employees and assets, Amtrak points to BNSF Railway and Union Pacific Railroad, noting that they have "reported significant reductions in accidents, maintenance/repair costs, and claims from accidents since implementing DriveCam." *See* Decl. of Michael Logue, Def. Mot. to Dismiss, Ex. 4, at ¶ 12.

The process by which changes in working conditions are negotiated is governed by statute. Section 6 of the RLA provides that "[c]arriers and representatives of the employees shall give at least thirty days' written notice of an intended change in agreements affecting rates of pay, rules, or working conditions, and . . . [i]n every case where such notice of intended change has been given . . . working conditions shall not be altered by the carrier until the controversy has been finally acted upon . . . ." 45 U.S.C. § 156. Amtrak qualifies as a "carrier" under the RLA, and the Unions qualify as "representatives." *See* Am. Compl. ¶¶ 1–3. Plaintiffs allege that Amtrak's unilateral installation of the DriveCam video and audio recording system violates § 156. *See id.* ¶ 23. The Unions allege that Amtrak did not engage in negotiations over the system and, in fact, misleadingly stated that it was required by federal law. *See id.* ¶¶ 13, 18–19. They have served Section 6 notices on Amtrak to prohibit DriveCam use, conferenced with Amtrak, and steadfastly opposed installation. *See id.* ¶¶ 14–22. The Unions have now come to this Court seeking a preliminary and permanent injunction to enjoin Amtrak from "installing the new surveillance equipment" and "implementing the new surveillance regime" at least until the parties have negotiated pursuant to the RLA. *See* Am. Compl. Request for Relief; Pls' Mot. for Prelim. Inj., at 1.

## III. ANALYSIS

### A. Legal Standard

Amtrak moves for dismissal under Rule 12(b)(1) on the basis that the Court lacks subject-matter jurisdiction over the Unions' claims. *See* Def. Mot. to Dismiss. Even if Amtrak had not so moved, the Court has a *sua sponte* responsibility to ensure that it indeed has subject-matter jurisdiction under the Constitution and statute. *Maldonado-Torres v. Mukasey*, 576 F. Supp. 2d 57, 58 (D.D.C. 2008) (citing *Doe by Fein v. Dist. of Columbia*, 93 F.3d 861, 871 (D.C. Cir. 1996)). The plaintiff has the burden of proving subject-matter jurisdiction, and its allegations are not entitled to presumptive truthfulness. *Carmona v. Snow*, 2007 WL 915220, at *2 (D.D.C. Mar. 26, 2007) (quoting *Mortensen v. First Federal Sav. & Loan Asso.*, 549 F.2d 884, 891 n.16 (3d Cir.1977)). Indeed, the Court must give the plaintiff's allegations "closer scrutiny when resolving a Rule 12(b)(1) motion than would be required for a Rule 12(b)(6) motion for failure to state a claim." *Ludvigson v. United States*, 525 F. Supp. 2d 55, 56 (D.D.C. 2007). In doing so, the Court may consider evidence outside of the pleadings. *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992); *Al-Owhali v. Ashcroft*, 279 F. Supp. 2d 13, 21 (D.D.C. 2003).

"Federal courts are courts of limited jurisdiction. They possess only that power authorized by Constitution and statute . . . ." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). Congress has the "prerogative to restrict the subject-matter jurisdiction of federal district courts" based on the types of claims brought by particular plaintiffs. *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 515 n.11 (2006). Congress has restricted the subject-matter jurisdiction of courts adjudicating certain cases under the RLA. *See* 45 U.S.C. § 153 First (q); *Union Pac. R.R. Co. v. Sheehan*, 439 U.S. 89, 93 (1978); *accord Consol. Rail Corp. v. Ry. Labor Execs.' Ass'n*, 491 U.S. 299, 304 (1989). When it comes to "minor disputes" under the RLA—

which concern the interpretation of contractual rights—the district courts have only limited review after the National Railroad Adjustment Board has issued an arbitral decision. *See Consol. Rail Corp.*, 491 U.S. at 302–04. However, federal district courts maintain jurisdiction over "major disputes," which concern the creation of contractual rights. *See id.* at 302–03. Historically, the line distinction between major and minor disputes came down to the "size" of the issues.[4] *Elgin, J. & E. Ry. Co. v. Burley*, 325 U.S. 711, 723–24 (1945), *adhered to on reh'g*, 327 U.S. 661 (1946). The "major disputes" concerned "large issues" that were more likely to cause a party to resort to economic self-help (for example, a union strike), justifying greater judicial recourse. *Id.* The minor disputes, in comparison, "affect the smaller differences which inevitably appear in the carrying out of major agreements and policies or arise incidentally in the course of an employment. They represent specific maladjustments of a detailed or individual quality. They seldom produce strikes, though in exaggerated instances they may do so." *Id.* at 724. At any rate, whether the Court has subject-matter jurisdiction here depends on whether the dispute at issue is a "major" or "minor" one as defined by the RLA.

To determine whether the dispute is major or minor under the RLA, courts look beyond the complaint to the arguments of the party asserting a contractual basis for the disputed action—here, Amtrak. *See Consol. Rail Corp.*, 491 U.S. at 305–07. If the actions can "arguably" be justified by the existing agreement, the dispute is minor and the courts do not have subject-matter jurisdiction. *See id.* at 306–07 (internal citation omitted). "Verbal formulations of this standard have differed over time and among the Circuits: phrases such as 'not arguably justified,'

---

[4] To be sure, the historical perspective presented here is meant only to inform the law; the Supreme Court has eschewed the classification of disputes as major or minor based on "a case-by-case determination of the importance of the issue presented or the likelihood that it would prompt the exercise of economic self-help." *See Consol. Rail Corp. v. Ry. Labor Execs.' Ass'n*, 491 U.S. 299, 305 (1989).

'obviously insubstantial,' 'spurious,' and 'frivolous' have been employed. . . . These locutions are essentially the same in their result. They illustrate the relatively light burden which the railroad must bear in establishing exclusive arbitral jurisdiction under the RLA." *Id.* (internal citations and quotations omitted). So, although the plaintiff has the burden of establishing subject-matter jurisdiction with facts showing jurisdiction, "[t]he employer [also] bears a 'relatively light burden' in persuading the court that the action is arguably justified" by the contract in light of the facts. *U.S. Airlines Pilots Ass'n ex rel. Cleary v. US Airways, Inc.*, 859 F. Supp. 2d 283, 303 (E.D.N.Y. 2012). Accordingly, "there is a strong presumption in favor of finding a dispute to be minor." *Oakey v. U.S. Airways Pilots Disability Income Plan*, 839 F. Supp. 2d 225, 231 (D.D.C. 2012), *aff'd*, 723 F.3d 227 (D.C. Cir. 2013). "[I]f doubt arises about the classification of a dispute, the dispute is also considered to be minor." *Bhd. of Maint. of Way Empls. v. Burlington N. Santa Fe R.R.*, 270 F.3d 637, 639 (8th Cir. 2001); *see also Oakey*, 839 F. Supp. 2d at 231.

If the Court does not have subject-matter jurisdiction, it cannot afford Plaintiffs any relief—injunctive or otherwise. *See Zukerberg v. D.C. Bd. of Elections & Ethics*, 999 F. Supp. 2d 79, 82 (D.D.C. 2013). Indeed, it "may not . . . 'resolve contested questions of law when its jurisdiction is in doubt.'" *Id.* (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101 (1998)).

**B. The Classification of the DriveCam System**

Given that subject-matter jurisdiction hinges on the type of dispute between Amtrak and the Unions, the question before the Court is whether Amtrak's installation of the DriveCam audio and video recording equipment, coupled with how events are actually captured and could be used to discipline employees, gives rise to a "major" or "minor" dispute. Stated differently,

the Court has subject-matter jurisdiction over the matter only if the program is not arguably justified by the existing agreements between the Unions and Amtrak. In determining whether the program is arguably justified by existing agreements, the Court does not use ordinary, common-law tools of contract interpretation. *See Consol. Rail Corp. v. Ry. Labor Executives' Ass'n*, 491 U.S. 299, 311–12 (1989); *Kan. City S. Ry. Co. v. Bhd. of Locomotive Eng'rs & Trainmen*, No. 13-838, 2013 WL 3874513, at *4 (W.D. La. July 25, 2013). Instead, it looks to "the common law of a particular industry or of a particular plant," in this case, the "whole employment relationship" between Amtrak and the Unions. *Consol. Rail Corp.*, 491 U.S. at 312. This is because a collective-bargaining agreement is more than an ordinary contract; "[i]t is a generalized code to govern a myriad of cases which the draftsmen cannot wholly anticipate." *Id.* at 311–12 (quoting *Transp. Union v. Union Pac. R. Co.*, 385 U.S. 157, 161 (1966)). Accordingly, "collective-bargaining agreements may include implied, as well as express, terms," and "'practice, usage and custom'" of the parties is instructive on deciphering the implied terms, just as it is on interpreting express terms. *See id.* at 312 (quoting *Transp. Union*, 385 U.S. at 161). An agreement cannot be implied based on prior isolated "occurrences of similar conduct," but requires conduct "understood by the parties to at least impliedly serve as if part of the collective bargaining agreement." *United Transp. Union, Local Lodge No. 31 v. St. Paul Union Depot Co.*, 434 F.2d 220, 222 (8th Cir. 1970) (citing *United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574 (1960); *accord Air Line Pilots Ass'n Int'l v. E. Air Lines, Inc.*, 863 F.2d 891, 897 (D.C. Cir. 1988).

Amtrak advances two overarching arguments to support its claim that the DriveCam system arises from rights in existing contracts. First, it argues that the CBA's explicit terms allow Amtrak to implement the program. *See* Def.'s Mot. to Dismiss at 15–17. Second, it

argues that the program is in line with longstanding practice and the Unions' acquiescence, making it part of a broader "implied contract." *See id.* at 17–20. The Court will address whether these arguments meet Amtrak's light burden for demonstrating a dispute over contractual terms in turn.

1. Express Terms of the CBAs

Amtrak argues that the existing CBAs contain express provisions showing that it "has the right to implement rules and procedures that are designed to promote safety, which is the primary reason for Amtrak's implementation of the DriveCam technology." *See* Def.'s Mot. to Dismiss at 15. In support of its argument, it cites the "safety rules" referenced in the CBAs and the parties' commitments to ensure that they will be "properly applied," the Unions' proposal to amend existing CBAs to disallow the DriveCam technology, and the lack of any express contractual prohibition. *See id.* In determining whether these contentions are sufficient so as to not be characterized as "frivolous," "spurious," or "obviously insubstantial," the Court does not judge the merits of Amtrak's contractual argument, but does take a "peek" at the justification to determine whether it is arguably rooted within the terms of the contract. *Oakey*, 839 F. Supp. 2d at 231–32. Courts generally look initially to the traditional tools of contractual interpretation in interpreting express terms of CBAs. *See, e.g.*, *Int'l Ass'n of Machinists & Aerospace Workers v. U.S. Airways, Inc.*, 358 F.3d 255, 261–62 (3d Cir. 2004). However, beyond that first step courts seem more inclined to look past the black letter provisions to the parties' assumptions about permissible actions. *See Air Line Pilots Ass'n Int'l*, 863 F.2d at 897. For example, in *Air Line Pilots Association International* the court looked beyond the black letter of the contract to the parties' assumptions. There, the parties' collective bargaining agreement contained "extensive procedures whereby union members may be furloughed." *See id.* Although the contract

contained no provision stating that furloughs were acceptable, "[t]he parties' explicit bargain over furlough procedures plainly rest[ed] on the premise that furloughs are permissible," and "thus a dispute over furloughs appear[ed] to be at least arguably comprehended within the . . . collective bargaining agreement." *See id.* Thus, the D.C. Circuit reversed the lower court's finding that the terms of the contract did not arguably support a furlough. *See id.* at 898.

The Circuit's holding in *Air Line Pilots Association International* favors dismissal here. As Amtrak has noted, the CBAs do not contain any express provision constraining Amtrak's authority to promulgate, implement, or enforce safety rules. The CBAs do however set forth identical safety agreements with the purpose of "ensuring compliance with Amtrak's Safety Rules." *See* Def.'s Mot. to Dismiss, Ex. 2, at 6; Def's Mot. to Dismiss, Ex. 3, at 8. Included within those agreements, under the heading "Work Place Safety," is the express agreement that "Amtrak and the [Unions] agree to use their best efforts to ensure that all . . . Amtrak safety rules are properly applied." Def.'s Mot. to Dismiss, Ex. 2, at 9; Def.'s Mot. to Dismiss, Ex. 3, at 10. So, although there are no express provisions providing for particular enforcement mechanisms for Amtrak's safety rules, the CBAs contemplate that Amtrak will implement safety rules and that the parties will take measures to ensure that they are followed. After all, if Amtrak does not enforce its safety rules, employees are justified to discontinue work. *See* Def.'s Mot. to Dismiss, Ex. 2, at 9 ("It shall not be a violation of . . . any company rule for employees to refuse to . . . work . . . when any condition exists that violates an . . . Amtrak Safety Rule . . . ."); Def.'s Mot. to Dismiss, Ex. 3, at 10–11. It is not "frivolous" or "obviously insubstantial" to conclude that the installation of DriveCam VERs constitute part of Amtrak's "best efforts" to ensure that its safety rules are properly applied. Indeed, Amtrak has stated that the primary purposes of the DriveCam system include the safety of its employees and equipment, and notes that similar DriveCam

systems have empirically reduced accidents for other companies, *see* Decl. of Michael Logue, Def. Mot. to Dismiss, Ex. 4, at ¶ 12. It is also not frivolous for Amtrak to contend that the CBAs contemplated unilateral promulgation of certain safety rules, and the unilateral implementation of measures to ensure enforcement.

Again, it is not for the Court to say whether the CBAs permit the installation of DriveCam VERs. *See Consol. Rail Corp.*, 491 U.S. at 320 ("[I]n no way do we suggest that [the union] is or is not entitled to prevail before the Board on the merits of the dispute."). But after taking a "peek" at the CBAs—with the Circuit's *Air Line Pilots Association International* decision in mind—the Court cannot say that Amtrak's arguments lack merit to the point of being frivolous.

2. Purported Implied Terms of the CBAs

The practices that Amtrak argues constitute implied terms of the CBAs confirm the finding that the Court lacks subject-matter jurisdiction over these claims in two ways. First, the "practice, usage and custom" inform the Court's analysis of the express terms of the CBAs. As noted above, "it is well established that the parties' 'practice, usage and custom' is of significance in interpreting their agreement." *Consol. Rail Corp.*, 491 U.S. at 311 (quoting *Transp. Union*, 385 U.S. at 161). The past practices of the parties confirm the Court's reasoning with respect to the explicit terms in the contract and further show that Amtrak's argument is not frivolous. Amtrak has unilaterally promulgated rules and enforced them for years, *see* Decl. of Susan K. Reinertson, Def. Mot. to Dismiss, Ex. 5, at ¶ 5 (stating that "employee policies and procedures . . . are created and implemented by Amtrak management"), and, although they quarrel with the *extent* of their knowledge, the Unions had knowledge of the promulgation and enforcement, *see* Decl. of Jed Dodd, Pl.'s Mem. in Opp. to Def.'s Mot. to Dismiss, Ex. 1, at ¶ 12.

This further demonstrates that Amtrak's argument that it was entitled to install the DriveCam system is not frivolous, spurious, or obviously insubstantial.

Second, the parties' past practices independently show an arguable basis for Amtrak's actions. As noted above, the only relevant past conduct by the parties is that "which has attained the dignity of a relationship understood by the parties to at least impliedly serve as if part of the collective bargaining agreement." *Air Line Pilots Ass'n Int'l*, 863 F.2d at 897 (internal quotations omitted) (citing *United Transp. Union, Local Lodge No. 31*, 434 F.2d at 22–23). In addition to conduct, courts look for "mutual understanding, either expressed or implied," and consider "factors . . . [including] the mutual intent of the parties, their knowledge of and acquiescence in the prior acts, along with evidence of whether there was joint participation in the prior course of conduct, all to be weighed with the facts and circumstances in the perspective of the present dispute." *Id.* (internal quotations omitted) (citing *United Transp. Union, Local Lodge No. 31*, 434 F.2d at 22–23).

The Unions quarrel with the notion that any implied terms of "surveillance" exist at all. *See* Pls.' Mem. Opp. to Mot. to Dismiss, at 10–11, ECF No. 13. They contend that Amtrak "has not shown any prior action that involves video and audio surveillance monitoring of [Union employees] at work," monitoring "over an extended period of time," or for the purposes that Amtrak is recording. *See id.* at 18. In fact, they argue that Amtrak has never previously used any form of audio surveillance at all. *See id.* at 6. With respect to the video monitoring, the Unions contend that their understanding was informed by the Department of Homeland Security funding, and that the video surveillance—described as "security systems"—would be used for the purpose of protecting against much larger security threats than car accidents. *See id.* at 19. They further argue that the TED system was used for security, not employee discipline, and

monitors employees only when they enter and exit work. *See id.* at 21. Finally, the Unions distinguish the GPS monitoring by noting that it does not monitor what is actually happening inside the vehicle, and who is actually in the vehicle. *See id.* at 22.

In light of the Unions' argument, the Court must address the threshold question of whether any implied CBA terms exist at all. The Unions may be correct that they have not acquiesced to any type of monitoring directly akin to the DriveCam system. However, they have undoubtedly acquiesced to "some monitoring." *See Kan. City S. Ry. Co. v. Bhd. of Locomotive Eng'rs & Trainmen*, 2013 WL 3874513, at *6 (W.D. La. July 25, 2013). They have acquiesced to video surveillance for the purpose of employee and public safety and security, for example. Their understanding that the purpose of the system was to monitor broader safety threats is irrelevant to the question of whether there is an implied term in the CBAs pertaining to some video monitoring. The same reasoning applies to the TED system; although the Unions' acquiescence does not mean that they necessarily consented to round-the-clock surveillance, it does show that they acquiesced to *some* video monitoring. The same is true for the GPS system and its relatively broad collection of data about the operation of Amtrak vehicles.

"What is not clear is whether [the Unions] have consented to" the particular type of monitoring embodied in the DriveCam system, and that inquiry is subject to the presumption in favor of Amtrak. *See id.* Before analyzing whether the DriveCam system is "arguably" within the scope of the implied terms of the CBAs, it is necessary to roughly identify the contours of the elusive implied term. The years of video monitoring show that the Unions have consented to some forms of video monitoring for safety and security purposes. The TED system—which has been in place since at least 2006—similarly shows that the Unions have consented to visual monitoring to ensure proper recording of time and access by personnel. The GPS system shows

that the Unions have consented to having employees' routes and vehicles monitored. The Unions have continued to acquiesce despite knowledge of the technology, and members being subjected to discipline based on it. Moreover, although the Unions place particular emphasis on the Department of Homeland Security's partial funding of the Amtrak video surveillance system, they never really explain why. To the extent that the Unions acquiesced because the system is used for security, the funding source does not seem to matter. So, at a very minimum, the CBAs contain an implied term permitting some level of monitoring for security purposes, through advanced technologies including, at some locations, continuous video surveillance.

The remaining question is whether Amtrak's claim that DriveCam is justified by the implied terms of the CBAs is frivolous. In *Consolidated Rail Corp.*, the company implemented a program requiring employees to submit to drug testing through urine samples. *See* 491 U.S. at 313–14. The Supreme Court noted that the parties' longstanding practice of "routinely . . . requir[ing] its employees to undergo physical examination under the supervision of its health services department" constituted an implied term of their collective-bargaining agreement, "established by longstanding past practice and acquiesced in by the [u]nion." *See id.* The Court went on to analyze the implied term, emphasizing three aspects of the practice of routine examination. First, the company "required its employees to undergo periodic physical examinations," which routinely required a urinalysis for blood sugar and albumin. *See id.* at 312–13. Second, the company required similar examinations for furloughed employees returning to duty. *See id.* at 313. Third, when employees had certain conditions (for example, they had previously suffered a heart attack), it required follow-up examinations. *See id.* If an employee did not meet the company's requirements during the physical, they could be forced to take leave without pay until it was corrected. *See id.* In finding that the unions also arguably

acquiesced to drug testing, the Court emphasized that the company ordered urinalysis in cases where the doctor suspected drug use, and required screening when an employee was suspended for drug use. *See id.*

Even more on point, in *Kansas City Southern Railway Co. v. Brotherhood of Locomotive Engineers & Trainmen*, with nearly identical facts to the case before the Court, the Western District of Louisiana found the use of internally-facing cameras that could capture some video arguably within the implied terms of the parties' collective-bargaining agreement. 2013 WL 3874513, at *6. The court there found that the acquiescence of "some monitoring" made the company's argument nonfrivolous, because the company had previously used stationary surveillance cameras, inward-pointing surveillance cameras in certain vans, and procedures for monitoring phone calls between train crew management and train crew employees. *See id*. at *5.

Once again without passing on the merits, a "peek" at the implied terms of the contract leaves no doubt that Amtrak's arguments are not frivolous, and therefore that the dispute is minor. Like the stationary video monitoring, the DriveCam is used primarily for safety. And, even though Amtrak has made clear that the system could be used for discipline, the Unions have known that other video monitoring can be used for discipline and have not objected. The same is true for TEDs and GPS monitoring; the Unions have acquiesced to certain periods and levels of monitoring at work through advanced technologies. In sum, the Unions have acquiesced to workplace monitoring of employees using advanced technologies which include, at some locations, continuous video surveillance and, in vehicles, GPS technology. Amtrak claims that the DriveCam system is an incremental change that falls within the Unions' acquiescence. The Unions disagree, insisting that the system has a completely new element of monitoring—audio recording—and is so pervasive as to be outside the scope of its previous acquiescence. The

question of where the system falls on the continuum of acquiescence is subject to proper argument and is therefore, by definition, a minor dispute. It is thus beyond the purview of the Court in light of its limited subject-matter jurisdiction.

## IV. CONCLUSION

For the foregoing reasons, Amtrak's motion to dismiss (ECF No. 8) is **GRANTED**, and, because this Court lacks jurisdiction, Unions' Motion for a Preliminary Injunction (ECF No. 4) must be **DENIED**. An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated: November 16, 2016

RUDOLPH CONTRERAS
United States District Judge